JONATHAN S. POLISH (IL Bar No. 6237890)
JEDEDIAH B. FORKNER (IL Bar No. 6299787)
PRO HAC VICE APPLICATIONS PENDING
175 W. Jackson Blvd., Suite 1450
Chicago, Illinois 60604
Email:  PolishJ@sec.gov
Telephone: (312) 353-7390
Facsimile:  (312) 886-8514

LOCAL COUNSEL:
AMY J. LONGO (Cal. Bar. No. 198304)
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Email: LongoA@sec.gov
Telephone: (323) 965-3998
Facsimile:  (213) 443-1904

Attorneys for Plaintiff
Securities and Exchange Commission

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>            Plaintiff,<br><br>    vs.<br><br>SAFEGUARD METALS LLC AND JEFFREY S. SANTULAN,<br><br>            Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT                                                    1

Plaintiff Securities and Exchange Commission ("Commission" or "SEC"), for its Complaint against Defendants Safeguard Metals LLC and Jeffrey S. Santulan, hereby alleges as follows:

## JURISDICTION AND VENUE

1.    The SEC brings this action pursuant to Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78u(d) and 78u(e)], and Section 209(d) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-9(d)].

2.    This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14], and 28 U.S.C. § 1331.

3.    Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. Acts, practices and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the Central District of California and elsewhere.

4.    Defendants directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein, and will continue to do so unless enjoined.

## SUMMARY

5.    From December 2017 through at least July 2021, defendants Safeguard Metals LLC, a California-based company that sells precious metals coins to retail investors, and Jeffrey S. Santulan, its owner, acted as investment advisers and persuaded investors to sell their existing securities, transfer the proceeds into self-directed Individual Retirement Accounts ("SDIRAs"), and invest the proceeds in gold and silver coins by making false and misleading statements about the safety and liquidity of the investors' securities investments, Safeguard's business, and its

compensation.

6.      Safeguard and Santulan targeted investors who were at or near retirement age through Safeguard's website, through online advertisements on sites like Facebook and Google, and through direct calls.  Santulan had authority over Safeguard's website, which during much of the relevant time period, falsely claimed that the company had $11 billion in assets under management and an office in London.  He also had authority over Safeguard's LinkedIn page, which was connected to fake profiles of prominent individuals in the securities industry showing that they were associated with Safeguard.

7.      Guided by scripts, some of which were prepared by Santulan, Safeguard sales agents made false and misleading statements to investors about the purported risks associated with the investors' existing securities holdings at investment banks and brokerage firms.  For example, Safeguard's sales agents stated that a "Money Market Reform Law" allowed banks and brokerage firms to freeze retirement accounts in the event of a market downturn; that top financial experts in the United States were saying that another recession was coming very soon; and that when that happened, the investors' accounts would be frozen and they would not be able to get any money out of their 401(k) plans or Individual Retirement Accounts ("IRAs").  These statements were misleading because, among other things, the law that Safeguard referenced applied only to money market funds in rare circumstances and could not result in an individual's entire account being frozen.

8.      Safeguard and Santulan also misled investors about Safeguard's commissions and markups on the coins.  Safeguard required investors to sign a "Precious Metals Shipping and Account Agreement" that was created by Santulan, and available on Safeguard's website.  During the relevant period, the form stated that Safeguard's "operating margin," or mark up, was usually 4% to 23%, depending on the type of coin or metal purchased (and 5% to 33% starting around January 2021).  In reality, Safeguard charged an average markup of approximately 64% on its

sales of silver coins, which constituted over 97% of the total coins it sold investors.

9.  Safeguard obtained approximately $67 million from the sale of coins to more than 450 mostly elderly, retail investors and kept approximately $25.5 million in markups on the price it paid to acquire the coins.

10.  The SEC brings this lawsuit to protect the investing public and to hold defendants accountable for their misconduct.

## DEFENDANTS

11.  Safeguard Metals LLC is a Wyoming Limited Liability Company with an office located in Woodland Hills, California.

12.  Jeffrey S. Santulan, age 41 is a resident of Tarzana, California.  He is the only member of Safeguard.  He owns 100% of the company.  Santulan controls Safeguard and its operations, and has exclusive authority over its business decisions. Santulan has used the pseudonym "Jeff Hill" while representing Safeguard to investors.

## FACTS

13.  ***Overview of Safeguard's Fraud.***  From the company's inception in late 2017 through at least July 2021 – which is referred to here as the "relevant period" – defendants engaged in a fraudulent scheme to induce investors to sell their existing securities and buy silver and gold coins from Safeguard.

14.  Safeguard and Santulan used high-pressure sales tactics and made materially false and misleading statements to investors who were at or near retirement age about the safety and liquidity of the investors' current securities holdings, Safeguard's business, and the markups Safeguard charged on the coins.  The goal was to convince the investors to liquidate their securities holdings and transfer their retirement money into a SDIRA with one of Safeguard's preferred custodians to purchase and hold the coins.  Once the SDIRA was funded, Santulan caused Safeguard to buy gold and silver coins from a precious metals wholesaler and sell them to the investors at substantial, undisclosed markups.

15. At the beginning of the scheme, Santulan personally handled virtually all aspects of Safeguard's business, including finding sales leads and contacting potential investors. Later, Santulan hired a number of sales agents to contact potential investors for Safeguard. Santulan drafted sales scripts for the sales agents to follow, provided training to certain of the sales agents, and established the commission rates to be paid to the sales agents. Santulan continued to handle most other aspects of the business himself, including buying the coins from the wholesaler and setting the prices at which Safeguard sold the coins to investors.

16. Safeguard and Santulan targeted investors who were 59 years and older. Many of the investors had limited investing experience in general, and virtually no experience investing in precious metals. Safeguard's sales agents – often using pseudonyms – called potential investors, many who had clicked on Safeguard's online ads about "retirement funds being at risk."

17. ***Lies about Safeguard's Business***. Throughout the scheme, Safeguard, Santulan, and the sales agents lied to investors about all aspects of Safeguard's business –including its size, experience, services, employees, and sophistication – in order to induce them to sell their securities and invest in Safeguard's coins. Santulan knew or was reckless in not knowing that these statements were false and misleading.

18. Safeguard held itself out as a full-service investment firm. A sales script used by Safeguard's sales agents falsely described Safeguard as "one of the largest wealth protection firms in North America." The sales agents described the company to potential investors as a "full service firm." Until sometime in 2020, Safeguard's website falsely claimed that the company had $11 billion in assets under management, and that Safeguard maintained an office in London. Safeguard's sales agents also boasted to investors about its offices in New York, New York and Beverly Hills, California.

19. None of that information was true. Safeguard's sole line of business was selling precious metal coins. It only had one office – a small, leased space on the

third floor of a modest office building in Woodland Hills, California.

20.     Until sometime in 2020, Safeguard's LinkedIn webpage connected to several fake profiles showing links between people in the securities industry and Safeguard.  For example, one LinkedIn entry falsely identified the president of a large, international investment bank as Safeguard's CFO.  Another LinkedIn entry falsely identified the general counsel of a large, registered broker-dealer as Safeguard's in-house attorney.  In reality, neither of those individuals had any relationship with Safeguard.

21.     Santulan was responsible for the creation of Safeguard's website and LinkedIn page and had authority over them.

22.     Safeguard's sales agents, in calls to potential investors, lied about their investment experience and qualifications.  For example, in a script provided to safeguard's sales agents, an "opener" sales agent was directed to introduce a "closer" sales agent to the potential investor as a "senior representative [who] has been helping retirees/conservatives protect their wealth for over 17 years now, including back in '08.  He actually specializes in 401k/IRAs and has far more expertise on your particular situation."  None of Safeguard's employees had experience remotely fitting that description.  Additionally, at least one Safeguard sales agent falsely represented to investors that he held a Financial Industry Regulatory Authority Series 7 securities license, even though he had never held any securities licenses.

23.     ***Misleading Statements about the Safety and Liquidity of the Investors' Securities Holdings***.  Safeguard made false and misleading statements to investors about the safety and liquidity of the investors' securities holdings, and employed scare tactics to induce the investors to sell their existing securities holdings.  Santulan knew or was reckless in not knowing about this conduct, and about the false and misleading statements made to potential investors.

24.     Defendants supplied Safeguard's sales agents with scripts to use during communications with investors, at least some of which were drafted by Santulan.  A

primary theme of Safeguard's sales agents' communications with investors was that investments in securities through traditional brokerage accounts were very risky, and that investors should protect their assets by moving their funds into an SDIRA.

25.    ***The Stock Market is Going to Crash.***  Safeguard sales agents told investors that the United States was headed for a recession that would result in significant losses in their existing securities holdings.  One of Safeguard's sales scripts directed the sales agents to say, among other things:

(a)    "The top financial echelons and economists in the US are saying this coming recession is going to be ***worse*** than 2008."[1]

(b)    "They're saying the last recession is going to be a walk in the park compared to what's coming."

(c)    "[Y]ou're just going to get wiped out ***completely***, like most people did in '08."

(d)    "[W]hy do you still have your life savings invested in the most expensive stock market of all time, in the 11th year of the most inflated bull market in US history?"

(e)    "You know what the definition of insanity is, right?  It's doing the same thing over and over again expecting a different result. That's exactly what you're doing in the stock market.  You lost [amount] in the 2008 crash, and here you are about to lose it all again."

26.    ***Retirement Funds will be Frozen.***  Defendants and their agents also claimed that investors' retirement money was at risk because Congress had recently passed a new, unpublicized law at the behest of "big banks" that gave the banks and brokerage firms the right to freeze retirement accounts in times of financial turmoil.

27.    Santulan led the charge on this front, sending an email to Safeguard's sales agents, instructing them to forward an email to investors stating, among other things: "This applies to Fidelity along with all other major financial brokerages. They will freeze your accounts by instituting redemption gates to limit these funds

---

[1] The emphasized parts of the script in this complaint are as they appeared in Safeguard's script for its sales force.

vulnerability to heavy withdrawals, during a financial crisis, for their benefit . . . These are troubled times, financially and beyond . . . [t]he solution for many conservative investors . . . is a no-fee, no tax Self-Directed IRA . . . It puts you back in control because it cannot be leveraged, frozen or converted into a bond."  The email concluded by directing investors to Safeguard's website, stating:  "Our goal is to provide you with knowledgeable insight and help guide conservatives towards a successful and sound retirement.  At our website, SafeguardMetals.com we help retirees and those preparing for retirement protect their retirement accounts."

28.     In addition, the Safeguard sales script instructed sales agents to say, among other things:

(a)     "[O]ne of the main concerns retirees have with their IRA/401ks is the passing of the Money Market Reform Act and whether or not they're going to have access to their money at **all**!"

(b)     "You need to see the law that allows your brokerage to legally freeze your 401k/IRA and how you can protect it."

(c)     "So when … all the largest financial institutions in the US are saying you're going to be ***frozen*** out of your retirement account, meaning you won't have access to ***any*** of your money in your 401k/IRA, that's not concerning to you?"

(d)     "So the top echelons of finance, Warren Buffet, Ray Dali, among others, are *all* predicting a liquidity freeze.  Meaning when the next stock market correction happens, your account will be frozen and you won't be able to get any money out of your 401k/IRA.  Are you saying you're smarter than the top echelons in finance?"

29.     In fact, there was no law that allowed banks and brokerage firms to freeze investors' retirement accounts.  Nor were the "top echelons in finance" predicting that their accounts would be frozen.  In reality, the law referenced by Safeguard and its sales agents applied only to money market fund investments, and it allowed liquidity fees and redemption gates to be implemented for money market investments temporarily under certain, rare circumstances.

30.    ***Securities Investments are Not Insured.***  In calls and emails with potential investors, Safeguard told investors that their securities investments were not insured by the Federal Deposit Insurance Corporation.  What they did not tell investors was that the precious metal coins it sold investors also were not insured by the FDIC.  Nor did Safeguard tell them that, unlike the coins, many securities investments held at broker-dealers are insured by the Securities Investor Protection Corporation ("SIPC").  According to SIPC's public website, sipc.org, "SIPC protects against the loss of cash and securities – such as stocks and bonds – held by a customer at a financially-troubled SIPC-member brokerage firm."  Safeguard's coins were not insured by SIPC.

31.    ***Precious Metals Provide Protection.***  After going through the list of purported risks associated with securities investments, Safeguard's sales agents regularly told investors that owning precious metals acted as a hedge against the risks of owning securities.  They recommended that investors place up to 20% of their assets in physical precious metals.  However, contrary to these representations, Safeguard regularly invested 100% of the investors' SDIRAs in gold and silver coins without regard to the investors' other assets.

32.    ***Lies about How Safeguard Was Paid***.  Safeguard and Santulan misled investors about the markups charged by Safeguard.

33.    Safeguard's sales agents generally did not mention Safeguard's markups to investors during their initial sales pitches.  Instead, the sales agents told investors that Safeguard would cover the recommended SDIRA custodian's account fees and any storage fees associated with holding the coins for the first year.  Occasionally, investors asked Safeguard sales agents how Safeguard made its money.  On at least several occasions, certain Safeguard sales agents falsely told potential investors on recorded calls that the only way Safeguard made money was by taking a 1% commission when customers sold their coins.  In fact, as those sales agents knew, Safeguard paid sales agents a total commission of 8% to 10% (split between the

COMPLAINT                                                9

opener and the closer) of the total amount charged to investors when the coins were purchased.

34.    Safeguard's website contained false information about the mark ups charged by Safeguard.  Each investor who purchased coins from Safeguard received and signed a copy of Safeguard's "Precious Metals Shipping and Account Agreement," which was created by Santulan and made available on Safeguard's website during the relevant period.  Until at least late 2020, this agreement stated that Safeguard's operating margin, which it defined as the difference between Safeguard's approximate acquiring cost of the coins and the price the investors paid, was usually between 4% and 23%, depending on the type of coin sold.  Later, defendants changed the agreement to state that Safeguard's "current" operating margin was usually 5% to 33%.  Both statements were false.

35.    In fact, Safeguard was compensated through substantial markups on the price of the silver coins, which constituted over 97% of the total coins it sold investors during the relevant period.  Safeguard charged an average markup of approximately 64% on its sales of silver coins during the relevant period – with markups ranging from approximately 30% to over 100%.  The markups on silver coins averaged 71% prior to 2021, and 52% during 2021.

36.    Santulan purchased all of Safeguard's coins from a precious metals wholesaler; determined the prices at which Safeguard sold the coins to investors; and knew or was reckless in not knowing that the markups greatly exceeded the operating margin listed in the "Precious Metals Shipping and Account Agreement" that he created, which appeared on Safeguard's public website.

37.    Safeguard's sales personnel, following Safeguard's sales scripts, told investors that the account statements they would receive from their SDIRA custodians would reflect the "melt value" of their coins rather than the actual value.  When investors questioned Safeguard about the values of their coins listed on their account statements, which were substantially lower than what the investors paid

Safeguard for the coins, Safeguard's sales agents told them that the statements were inaccurate. The actual value of the coins, Safeguard's sales agents assured the investors, was far higher.

38.    Defendants did not disclose the actual markups on the coins to Safeguard's investors.

39.    Defendants also did not disclose to investors that they paid Safeguard's sales agents commissions of 8% to 10%.

40.    ***Safeguard and Santulan Acted as Investment Advisers***. When persuading investors to sell their securities in order to invest in coins, Safeguard and Santulan acted as investment advisers.

41.    As discussed above, Safeguard engaged in the business of providing investment advice. Its business model depended on sales personnel reaching out to investors on a daily basis to convince them to sell their securities. Safeguard held itself out as a full service investment firm, touted alleged relationships with securities industry professionals, and received compensation from investors in the form of markups on the coins that it sold. Safeguard's sales agents, relying on the sales scripts and the on-the-job training they received from Santulan or others at Safeguard, convinced investors to sell their existing securities holdings by providing advice about the purported risks associated with their securities holdings; current and future market trends, including the likelihood of another recession; and appropriate asset allocation.

42.    Santulan also acted as an investment adviser. Santulan founded Safeguard, owned 100% of the company, and had total control over the company's operations. Santulan devised Safeguard's business strategy of targeting elderly investors to convince them to sell their securities and invest the proceeds in coins. Initially, Santulan personally handled all aspects of Safeguard's business, including personally contacting investors. Later, Santulan hired Safeguard's sales agents, created Safeguard's initial sales pitch, drafted certain sales scripts, and personally

trained some of Safeguard's sales agents.  As Safeguard's owner, Santulan received compensation in the form of the mark ups Safeguard charged on the coins it sold to investors.

43.    Safeguard also assisted investors with selling their existing securities. Once an investor agreed to invest with Safeguard, the Safeguard sales agent helped the investor  to complete the SDIRA application; to contact their broker-dealer or other asset custodian in order to initiate the liquidation of their current securities holdings; and to transfer funds to an SDIRA.  At times, Safeguard sales agents joined investors on these calls to their broker-dealers or other asset custodians.  Safeguard's investors transferred cash into their new SDIRAs rather than transferring any existing investments.  Investors often sold mutual funds, annuities and other securities to raise the money to fund the SDIRA.  In almost all cases, the full amount of funds that were moved into the SDIRA were used to purchase coins from Safeguard.

44.    ***Defendants' Gains***.  During the relevant period, Safeguard obtained approximately $67 million from the sale of gold and silver coins to more than 450 mostly elderly, retail investors.  Safeguard kept approximately $25.5 million of the approximately $67 million paid by investors for itself in the form of markups on the price Safeguard paid for the coins.

## FIRST CLAIM FOR RELIEF

## Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5
## (Against Defendants Safeguard and Santulan)

45.    The SEC alleges and incorporates by reference paragraphs 1 through 44 above.

46.    As more fully described in paragraphs 1 through 45 above, defendants Safeguard and Santulan, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly:  used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities.

47.     Safeguard and Santulan knew, or were reckless in not knowing, of the facts and circumstances described in paragraphs 1 through 45 above.

48.     By reason of the foregoing, Safeguard and Santulan violated Section 10(b) of the Exchange Act [15 U.S.C. §78j (b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Violations of Advisers Act Sections 206(1) and 206(2)

### (Against Defendants Safeguard and Santulan)

49.     As more fully described in paragraphs 1 through 44 above, at all times alleged in this complaint, defendants Safeguard and Santulan, while acting as investment advisers, by use of the mails, and the means and instrumentalities of interstate commerce, directly or indirectly, knowingly, willfully or recklessly:  (i) employed devices, schemes or artifices to defraud its clients or prospective clients; and (ii) engaged in transactions, practices and courses of business which have operated as a fraud or deceit upon its clients or prospective clients.

50.     By reason of the foregoing, Safeguard and Santulan violated Sections 206(1) and 206(2) of the Advisers Act. [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## THIRD CLAIM FOR RELIEF

### Aiding & Abetting Violations of Section 10(b) of the Exchange Act,

### And Exchange Act Rule 10b-5

### (Against Defendant Santulan)

51.     The SEC alleges and incorporates by reference paragraphs 1 through 44 above.

52.     Safeguard, in connection with the purchase and sale of securities, by the

use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly:  used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities.  Safeguard knew, or was reckless in not knowing, of the facts and circumstances described in paragraphs 1 through 45 above.

53.    Santulan knowingly or recklessly provided substantial assistance to safeguard in its violation of Sections 10(b) of the Exchange Act and Rule 10b-5 thereunder.  Santulan provided substantial assistance in the violations by, among other things, creating the scripts used by Safeguard's sale agents; creating the account agreement that contained false information about Safeguard's markups; and establishing the sales prices of the coins at a level that far exceeded the markups disclosed to investors.  Santulan knew or was reckless in not knowing that Safeguard was committing violations, and he had a role in furthering them.

54.    By engaging in the conduct described above, Santulan aided and abetted violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j (b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

### FOURTH CLAIM FOR RELIEF

### Aiding & Abetting Violations of Advisers Act Sections 206(1) and 206(2)
### (against Defendant Santulan)

55.    The SEC realleges and incorporates by reference paragraphs 1 through 44 above.

56.    As more fully described in paragraphs 1 through 44 above, at all times alleged in this complaint, defendant Safeguard, while acting as an investment adviser, by use of the mails, and the means and instrumentalities of interstate commerce,

directly or indirectly, knowingly, willfully or recklessly:  (i) employed devices, schemes or artifices to defraud its clients or prospective clients; and (ii) engaged in transactions, practices and courses of business which have operated as a fraud or deceit upon its clients or prospective clients.  By reason of the foregoing, Safeguard has violated Sections 206(1) and 206(2) of the Advisers Act. [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

57.    Santulan knowingly or recklessly provided substantial assistance to Safeguard in its violation of Sections 10(b) of the Exchange Act and Rule 10b-5 thereunder.

58.    By engaging in the conduct described above, Santulan aided and abetted violations of Sections 206(1) and 206(2) of the Advisers Act. [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## FIFTH CLAIM FOR RELIEF

### Control Person Liability for Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5

### (against Defendant Santulan)

59.    The SEC realleges and incorporates by reference paragraphs 1 through 44 above.

60.    Safeguard, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly:  used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities. Safeguard knew, or was reckless in not knowing, of the facts and circumstances described in paragraphs 1 through 45 above.

61.     When Safeguard violated Section 10(b) of the Exchange Act and Rule 10b-5, Santulan directly or indirectly controlled Safeguard.  Santulan was therefore a "controlling person" within the meaning of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] with regard to Safeguard.

62.     As alleged above, Santulan was a culpable participant in, and directly or indirectly induced the acts constituting Safeguard's violations of the Exchange Act, and did not act in good faith.

63.     By reason of the foregoing, Santulan is jointly and severally liable with and to the same extent as Safeguard for its violations of Section 10(b) of the Exchange Act and Rule 10b-5 and, unless enjoined, will again act as a "controlling person" in connection with such violations.

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Permanently enjoin defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the order of this Court, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder, and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### II.

Order defendants to disgorge the ill-gotten gains received because of the violations alleged in this Complaint, including prejudgment interest, pursuant to Section 21(d)(5) and 21(d)(7) of the Exchange Act  [15 U.S.C. §§ 78u(d)(5), and 78u(d)(7)].

### III.

Order defendants to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

### JURY DEMAND

The Commission hereby requests a trial by jury.


Dated:  February 1, 2022

/s/ Amy J. Longo
Amy J. Longo
Attorney for Plaintiff
Securities and Exchange Commission