1
2
3
4
5
6
7
8
9
10
11

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>        Plaintiff,<br><br>    vs.<br>SAFEGUARD METALS LLC AND JEFFREY IKAHN,<br>        Defendants. | Case No. 2:22-CV-00693 JFW (SKx)<br>Hon. John F. Walter, Crtrm 7A<br><br>**STATEMENT OF DECISION GRANTING PLAINTIFF'S MOTION FOR REMEDIES** |

## FACTUAL AND PROCEDURAL BACKGROUND

On February 1, 2022, the United States Securities and Exchange Commission ("SEC" or "Plaintiff") filed a Complaint alleging that Safeguard Metals LLC ("Safeguard" or "Safeguard Metals") and Jeffrey Ikahn[1] violated the anti-fraud provisions of the federal securities laws. Safeguard and Ikahn (collectively, "Defendants") agreed to a bifurcated process for resolving the SEC's claims against them. Without admitting or denying the SEC's allegations, Defendants consented to entry of a judgment which, among other things, subjected them to permanent injunctive relief and prohibited them from engaging in future violations of the federal securities laws. (Dkts 57-1, ¶ 1; 57-2, ¶ 1.) On June 14, 2023, this Court entered judgments against Defendants. (Dkts 58, 59.) The bifurcated agreements left for this Court to determine, upon motion by the SEC, the amount of disgorgement, prejudgment interest and civil penalties Defendants must pay. (Dkts 58, § III; 59, § III.) Defendants agreed that, in connection with the SEC's motion for monetary relief, the allegations against them "shall be accepted as and deemed true by the Court." (Dkts 57-1, ¶ 5; 57-2, ¶ 5; 58, § III(c); 59, § III(c).) On April 3, 2025, the SEC filed its motion for remedies. (Dkt 66.) Defendants failed to timely file an Opposition.

Safeguard was a Wyoming Limited Liability Company with an office in Woodland Hills, California that sold precious metals coins to retail investors. (*See* Compl. ¶¶ 5, 11, 13.) Ikahn was the only member of Safeguard -- at all relevant times he owned 100% of the company. *Id.* ¶ 12. Ikahn controlled Safeguard and its operations, and had exclusive authority over its business decisions. *Id.*

---

[1] At the time the SEC brought this action, Jeffrey Ikahn had changed his last name from Jeffrey Santulan. The SEC amended its Complaint in light of this name change. (Dkt 55.) The Amended Complaint is referred to here at the "Complaint" or "Compl.," and the individual defendant is called "Ikahn."

From December 2017 through at least July 2021, Safeguard and Ikahn engaged in a fraudulent scheme to induce investors to sell their existing securities and buy silver and gold coins from Safeguard. *Id.* ¶¶ 5, 13. At the beginning of the scheme, Ikahn personally handled nearly all aspects of Safeguard's business, including finding sales leads and contacting potential investors. *Id.* ¶ 15. Ikahn then began to hire sales agents to contact potential investors. *Id.* Ikahn drafted sales scripts for the sales agents, provided training to some sales agents, and established their commission rates. *Id.* Ikahn continued to handle most other aspects of the business, including buying the coins from the wholesaler and setting the prices at which Safeguard sold the coins to investors. *Id.*

Through Safeguard's website, online advertisements, websites like Facebook and Google, and direct calls, Safeguard and Ikahn targeted investors who were at or near retirement age. *Id.* ¶ 6. Many prospective investors had limited investing experience in general, and virtually no experience investing in precious metals. *Id.* ¶ 16.

Safeguard's sales agents -- often using pseudonyms -- called potential investors, many of whom had clicked on Safeguard's online ads about "retirement funds being at risk." *Id.* The goal was to persuade investors to liquidate their securities holdings and transfer their money into a self-directed IRA ("SDIRA") with one of Safeguard's preferred custodians to buy and hold the coins. *Id.* ¶ 14. Once the SDIRA was funded, Ikahn caused Safeguard to buy gold and silver coins from a precious metals wholesaler and sell them to the investors at substantial, undisclosed markups. *Id.*

Throughout the scheme, Safeguard, Ikahn and the sales agents lied to potential investors about all aspects of Safeguard's business -- including its size, experience, services, employees and sophistication -- to induce them to sell their securities and invest in Safeguard's coins. *Id.* ¶ 17. Ikahn knew or was reckless in not knowing that these statements were false and misleading. *Id.*

Defendants fraudulently induced investors to sell securities using false and misleading statements about the safety and liquidity of their securities holdings. *Id.* ¶ 23. Defendants also claimed that investors' retirement money was at risk because Congress had passed a new, unpublicized law that gave banks and brokerage firms the right to freeze retirement accounts in times of financial turmoil. *Id.* ¶ 26.

In addition, Defendants misled investors about Safeguard's markups. *Id.* ¶ 32. Investors who bought coins from Safeguard received and signed a copy of Safeguard's "Precious Metals Shipping and Account Agreement," which was created by Ikahn and made available on Safeguard's website. *Id.* ¶ 34. Until at least late 2020, the agreement stated that Safeguard's operating margin, which it defined as the difference between Safeguard's approximate acquiring cost of the coins and the price the investors paid, was usually between 4% and 23%, depending on the type of coin sold. *Id.* Defendants subsequently changed the agreement to state that Safeguard's "current" operating margin was usually 5% to 33%. *Id.* However, both statements were false. *Id.* In fact, for silver coins -- which constituted over 97% of Safeguard's coin sales -- Defendants charged an average markup of around 64%, with markups ranging from about 30% to over 100%. *Id.* ¶ 35. Defendants never disclosed the actual markups to investors. *Id.* ¶ 38.

During the relevant period, Safeguard sold approximately $67,000,000 of gold and silver coins to more than 450 mostly elderly, retail investors. *Id.* ¶ 44. Of the approximately $67,000,000 in sales, approximately $25,569,303 were markups on the price Safeguard paid for the coins. *Id.*

## DISCUSSION

Based on Defendants' misconduct, the Court concludes that Defendants are liable for violating the antifraud provisions of the Investment Advisers Act of

3

1940 ("Advisers Act") and the Securities Exchange Act of 1934 ("Exchange
Act") and Rule 10b-5 thereunder. *Id.,* ¶¶ 45-50. In addition, Ikahn is liable for
aiding and abetting Safeguard's violations of the antifraud provisions of the
Exchange Act and Advisers Act and for acting as a control person for Safeguard's
violations of the antifraud provisions of the Exchange Act. *Id.*, ¶¶ 51-63.

## I.    Defendants Violated the Anti-Fraud Provisions of the Investment Advisers Act of 1940

Defendants are investment advisers. Section 202(a)(11) of the Advisers Act
defines an "investment adviser" as any person who (1) for compensation (2) is
engaged in the business of (3) providing advice to others or issuing reports or
analyses regarding securities. 15 U.S.C. § 80b-2(a)(11).

Ikahn and Safeguard meet the definition of an investment adviser. Ikahn
was the only member of Safeguard, owned 100% of the company, and had total
control over the company and its operations. *Id.* ¶¶ 12, 42. At first, he handled all
aspects of Safeguard's business, including personally contacting investors. *Id.* ¶¶
15, 42. Ikahn subsequently created Safeguard's initial sales pitch, drafted certain
sales scripts, hired Safeguard's sales agents, and provided training to certain of
Safeguard's sales agents. *Id.* ¶¶ 14-15, 42. Safeguard engaged in the business of
providing investment advice; its business model depended on its sales agents
regularly reaching out to potential investors to persuade them to sell their
securities holdings. *Id.* ¶ 41. Safeguard even held itself out as a full-service
investment firm in both written and oral statements to investors. *Id.* ¶ 18. In
addition, on its public website, Safeguard claimed (falsely) that it had billions of
dollars in assets under management, a term used throughout the securities
industry by investment advisers. *Id.* Safeguard also emphasized its connections
with securities industry professionals and the securities industry experience of its
own employees. *Id.* ¶¶ 20, 22. And Safeguard's sales agents advised investors

about the purported disadvantages of investing in securities through traditional brokerage accounts and for investing in coins. *Id.* ¶¶ 24-31, 41. The advice given by Safeguard qualifies as advice about securities because Safeguard discussed with clients: (i) purported risks associated with securities investments; (ii) market trends, including the likelihood of a pending recession and its effect on the stock market; and (iii) asset allocation, including the relationship between the value of coins and the value of securities and the portions of their portfolios that should be invested in coins. *Id.* Each of these pieces of advice fits squarely within the definition of an investment adviser as stated in the Advisers Act. *See Applicability of the Investment Advisers Act of 1940 to Financial Planners, Pension Consultants, and Other Persons Who Provide Others with Investment Advice as a Component of Other Financial Services*, Advisers Act Rel. No. 1092, at 5-6 (Oct. 8, 1987). Ikahn and Safeguard received compensation in the form of the markups Safeguard charged on the coins. *Id.* ¶ 42. As a result, Ikahn and Safeguard are properly designated as investment advisers within the broad definition in the Advisers Act. *See, e.g.*, *SEC v. Berger*, 244 F. Supp. 2d 180, 193 (S.D.N.Y. 2001) ("Because Berger effectively controlled MCM and its decision making, Berger is also properly labeled an investment adviser within the meaning of the Advisers Act.").

Sections 206(1) and 206(2) of the Advisers Act make it unlawful for any investment adviser to employ any device, scheme or artifice to defraud clients or prospective clients or to engage in any transaction, practice or course of business that defrauds clients or prospective clients. 15 U.S.C. §§ 80b-6(1) and 80b-6(2). An investment adviser has a fiduciary duty including "an affirmative duty of utmost good faith, and full and fair disclosure of all material facts." *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 191-94 (1963). Violations of Section 206(1) require a showing of scienter; negligence is sufficient for violations of Section 206(2). *See Steadman v. SEC*, 603 F.2d 1126, 1134 (5th Cir. 1979). Scienter has been defined as a "mental state embracing the intent to deceive, manipulate or

defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94, 213 (1976). Reckless disregard of the truth satisfies the scienter requirement. *See*, *e.g.*, *Gebhart v. SEC*, 595 F.3d 1034, 1040-41 (9th Cir. 2010). A misstatement or omission is material if there is "a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

Safeguard and Ikahn violated Sections 206(1) and 206(2) of the Advisers Act by making many misrepresentations and engaging in other fraudulent conduct. In particular, Safeguard misrepresented its business by falsely claiming on its public website, over which Ikahn had authority, that it had $11 billion in assets under management and offices around the world. Compl. ¶¶ 18, 21. Safeguard's LinkedIn web page, over which Ikahn also had authority, was connected to several fake profiles showing links between people in the securities industry and Safeguard. *Id.* ¶¶ 20, 21. In addition, Safeguard and its sales agents made false statements to investors about their investment experience and qualifications, including in the securities industry. *Id.* ¶ 22. Safeguard and its sales agents also made many false and misleading statements to investors about the safety of their securities accounts, including that their accounts were at risk of being frozen in the event of a market downturn because of the "Money Market Reform Law," that their securities investments were not insured by the FDIC, and that only by moving their funds into a SDIRA could they avoid these risks. *Id.* ¶¶ 24-28. These statements were misleading because the law that Safeguard referenced applies only to money market funds and could not result in an individual's entire account being frozen. *Id.* ¶¶ 29-30. The coins that Safeguard recommended were not FDIC-insured. *Id.* Certain of Safeguard's sales agents also told investors that the firm would receive only a 1% commission when the investors sold the coins. *Id.* ¶¶ 33-35. The agreements Ikahn created for Safeguard stated that the firm's markup usually was between 4% and 23% (or later, up to

33%). *Id.* In fact, Ikahn caused Safeguard to receive an average markup of 64%
on silver coins -- which made up most of its sales. *Id.* These statements were
material; they related to the nature of Safeguard's business and the risks, safety
and costs of the investments. *See TSC Indus., Inc.* at 449. And Safeguard and
Ikahn acted at least recklessly in making these misrepresentations. Compl. ¶ 49.

During the relevant period, Safeguard sold about $67,000,000 of gold and
silver coins to more than 450 mostly elderly, retail investors. *Id.* ¶ 44. Of that
amount, about $25,569,303 were markups on the price Safeguard paid for the
coins. *Id. See also* Declaration of SEC Accountant Jean Javorski ("Javorski
Decl."), ¶ 9.

## II.    Defendants Violated the Anti-Fraud Provisions of the Securities Act of 1933 and Exchange Act of 1934

*Material Misrepresentations and Omissions Liability*. The SEC states a claim
for a violation of Section 10(b) and Rule 10b-5(b) of the Exchange Act for
material misstatements or omissions by alleging facts establishing that
Defendants: (1) made a material misrepresentation or omission (2) in connection
with the purchase or sale of a security (3) with scienter (4) in interstate
commerce. *See SEC v. Sidoti*, 2021 WL 1593253, at *7 (C.D. Cal. Mar. 19, 2021)
(citations omitted; cleaned up). The Complaint sets forth detailed factual
allegations about Defendants' material misrepresentations to investors, including
lies about Safeguard's business (Compl. ¶¶ 18-22); a nonexistent law that
empowered banks and brokerages to wrest control of investors' nest eggs (*Id.* ¶¶
26-28); the amount of Safeguard's markups on coins (*Id.* ¶¶ 34-36); and
Safeguard's commissions (*Id.* ¶ 33).
These factual allegations state a viable claim under Rule 10b-5(b).

*Scheme Liability*. "To state a claim for a scheme to defraud under Section
17(a)(1) or (a)(3), or under Rule 10b-5(a) or (c), the SEC must allege that the

defendant 'engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme' in the offer or sale (for Section 17(a)) or in connection with the purchase or sale (for Section 10(b)) of a security." *Sidoti*, 2021 WL 1593253, at *9. These provisions "capture a wide range of conduct." *Lorenzo v. SEC*, 587 U.S. 71, 79 (2019). "This includes 'manipulative or deceptive act[s] in furtherance of a scheme[,]' which transactions 'create the false appearance of fact.'" *Sidoti*, 2021 WL 1593253, at *9.

The SEC's Complaint details Defendants' many materially false and misleading statements to investors regarding Safeguard's size, experience, services, employees and sophistication; the safety and liquidity of investors' securities holdings; and the fees and markups charged on the coin investments. Compl. ¶¶ 6, 20-21, 27, 30. The SEC also alleges detailed factual allegations establishing the materiality of such misrepresentations and omissions. *See, e.g.*, *SEC v. Wayland*, 2019 WL 2620669, at *5 (C.D. Cal. Apr. 8, 2019) (lies about the *experience* of the company's directors held material). Defendants' lies about the substantial markups to the coins and their commissions, Compl. ¶¶ 32-39, were also material. "[T]he disclosure of commissions and other compensation is fundamental to securities laws." *SEC v. All. Leasing Corp.,* 2000 WL 35612001, at *9 (S.D. Cal. Mar. 20, 2000).

Defendants' lies were in connection with the sale of securities. The Supreme Court has consistently held that the "in connection with" language from Section 10(b) of the Exchange Act should be interpreted broadly; it "is enough that the fraud alleged 'coincide' with a securities transaction." *Merrill Lynch, Pierce, Fenner & Smith v. Dabit*, 547 U.S. 71, 85 (2006). The Supreme Court has also noted that "neither the SEC nor [the Supreme] Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act." *SEC v. Zandford*, 535 U.S. 813, 820 (2002). Accordingly, the

Court held in *Zandford* that a broker who "sells customer securities with the intent to misappropriate the proceeds" has committed fraud "in connection with" the sales even though "the sales themselves were perfectly lawful." *Id*. at 820. The "securities sales and respondent's fraudulent practices were not independent events…[r]ather, respondent's fraud coincided with the sales themselves." *Id*.

As with the broker in *Zandford*, Safeguard's and Ikahn's fraudulent conduct and the sales of securities were not independent events. Rather, Defendants' fraud coincided with the sales of securities. Defendants fraudulently persuaded investors to sell their securities to fund coin purchases from Safeguard. Compl. ¶¶ 13-14. In other words, convincing investors to sell their securities was a necessary step before Defendants could get their hands on the investors' money. SEC accountant Jean Javorski reviewed information related to 169 Safeguard investors. Of those, Ms. Javorski determined that at least 50 investors sold securities to fund their purchases of coins from Safeguard, and at least another 100 investors transferred money from a retirement account to pay for coins. *See* Javorski Decl. ¶¶ 12-14.

### III.    Ikahn's Secondary Liability

Ikahn is liable for Safeguard's primary violations because he is a "control person" of Safeguard. He aided and abetted Safeguard's primary violations of the securities laws. Under Section 20(a) of the Exchange Act, "a defendant may be liable for securities violations if (1) there is a violation of the Act and (2) the defendant directly or indirectly controls any person liable for the violation." *SEC v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011).

Aiding and abetting liability requires: (1) the existence of an independent primary violation; (2) knowledge or reckless disregard by the alleged aider and abettor of the primary violation and of his or her own role in furthering it; and (3) "substantial assistance" in the commission of the primary violation. *See*

Advisers Act Section 209(f); Exchange Act Section 20(e); *Ponce v. SEC*, 345 F.3d 722, 737 (9th Cir. 2003); *SEC v. Fehn*, 97 F.3d 1276, 1288 (9th Cir. 1996).

The first element of both control person and aiding and abetting liability is the existence of an independent primary violation of the securities laws, here, the violations by Safeguard Metals.

Control person liability further requires that Ikahn had sufficient control over Safeguard to be liable for its violations. Ikahn was the only member of Safeguard Metals LLC. *Id.* ¶ 12. He was the sole owner of Safeguard at all relevant times. *Id.* Ikahn controlled the company's operations and had exclusive authority over its business decisions. *Id.* Ikahn first handled all aspects of Safeguard's business, including finding sales leads and contacting potential investors. *Id.* ¶ 15. Ikahn subsequently hired and trained sales agents and drafted sales scripts for the agents to follow. *Id.* Ikahn continued to handle most other aspects of Safeguard's business, including buying coins from the wholesaler and setting the prices at which Safeguard sold the coins to investors. *Id.* Ikahn created the account agreement that Safeguard entered into with investors. *Id.* ¶ 34. Ikahn was also responsible for the creation of Safeguard's website and LinkedIn page and had authority over them. *Id.* ¶ 21. Ikahn did not act in good faith. *Id.* ¶ 62.

Ikahn also knew or recklessly disregarded Safeguard's violations, and he provided "substantial assistance" in the commission of the primary violations. In this case, Ikahn knew all about the fraud, because he directed and participated in the fraudulent conduct himself. *Id*. ¶¶ 12, 15, 18, 20-21, 34, and 37.

The element of substantial assistance is met when the defendant "in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed." *SEC v. Apuzzo*, 689 F.3d 204, 206-07 (2d Cir. 2012). Alleging "a high degree of actual knowledge of the primary violation" may lessen the burden that must be met in alleging substantial assistance, and vice versa. *Id.* at 214.

Ikahn both was keenly aware of the primary violation, and substantially assisted
in the fraudulent scheme in the manner set forth above.

## IV.    Disgorgement, Prejudgment Interest and Civil Penalties Are Appropriate

### A.    The SEC has Provided A Reasonable Approximation of Defendants' Ill-Gotten Gains

"The district court has broad equity powers to order the disgorgement of
'ill-gotten gains' obtained through the violation of the securities laws." *SEC v.
First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998) (collecting cases).
"Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to
deter others from violating securities laws by making violations unprofitable." *Id.*
"Further, where two or more individuals or entities collaborate or have a close
relationship in engaging in the violations of the securities laws, they have been
held jointly and severally liable for the disgorgement of illegally obtained
proceeds." *Id.*

In a motion seeking disgorgement, the SEC need only present evidence of a
"reasonable approximation" of a defendant's ill-gotten gains. *SEC v. Griffithe*,
2021 WL 6551385, at *1 (C.D. Cal. Nov. 18, 2021), *aff'd sub nom. SEC v. Russell*,
2023 WL 4946603 (9th Cir. Aug. 3, 2023).

The SEC seeks $25,569,303, jointly and severally, from Defendants in
disgorgement. This amount represents the total amount that Safeguard and Ikahn
obtained from investors -- $66,948,960 -- less the $41,379,657 that Safeguard and
Ikahn paid to metals wholesalers for the coins they sold. *See* Javorski Decl., ¶¶ 8-
9. This amount constitutes a reasonable approximation of Defendants' profits
from their securities laws violations, and thus satisfies the SEC's burden of
calculating disgorgement. *See SEC v. Sripetch*, 2024 WL 1546917, at *7 (S.D. Cal.
Apr. 8, 2024).

### B.    Prejudgment Interest

"Awards of disgorgement typically include prejudgment interest to ensure that the wrongdoer does not profit from the illegal activity." *Sripetch*, 2024 WL 1546917, at \*7. Defendants agreed to pay prejudgment interest on any disgorgement awarded, to be calculated from December 1, 2017, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax. (*Id.,* 57-1, ¶ 5; 57-2, ¶ 5.) Both the SEC and federal courts routinely calculate prejudgment interest using the IRS rate for the underpayment of federal income tax. *Sripetch,* 2024 WL 1546917, at \*7. In this case, the Court concludes that the SEC is entitled to prejudgment interest in the amount indicated in its proposed Judgments.

### C.    Civil Penalties

Federal courts may impose civil monetary penalties for securities law violations. *See* Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]. There are three levels, or tiers, of civil penalties available for "each violation" of the securities laws. *See* 15 U.S.C. § 78u(d)(3). The third and highest tier applies when the violation (i) "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and (ii) "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 78u(d)(3)(B)(iii). The maximum amount of a third-tier penalty for each such violation is the greater of the amount set by statute *or* the "gross pecuniary gain to the defendant." *SEC v. Moleski*, 2021 WL 6752254, at \*7 (C.D. Cal. Oct. 21, 2021).

"Civil penalties were enacted by Congress to achieve the dual goals of punishment of the individual and deterrence of future violations." *SEC v. Glob. Health*, 2006 WL 4005575, at \*3 (S.D. Cal. Dec. 11, 2006) (cleaned up). The

amount of any civil penalty is committed to the discretion of the Court based on the facts and circumstances of the case. See 15 U.S.C. § 78u(d)(3)(A)(i). In determining the civil penalties to award, courts routinely consider: (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of the defendant's professional occupation, that future violations might occur; and (5) the sincerity of the defendant's assurances against future violations. *SEC v. VerdeGroup Inv. Partners, Inc.*, 2022 WL 2200409, at *6 (C.D. Cal. Jan. 14, 2022).

These factors all compel imposing a penalty against Defendants amounting to $25,569,303 -- an amount equivalent to the amount of Defendants' ill-gotten gains. Ikahn designed Safeguard's business model to defraud elderly investors out of their retirement savings. In doing so, Defendants acted with a high level of scienter, committed hundreds of violations of the securities laws, and created a substantial risk of loss to many investors. *Cf. SEC v. Wilde*, 2012 WL 6621747, at *16 (C.D. Cal. Dec. 17, 2012) (imposing third tier penalties against entity and individuals in "prime bank" scheme); *SEC v. mUrgent Corp.,* 2012 WL 630219, at *2-3 (C.D. Cal. Feb. 28, 2012) (third tier penalties are appropriate against entity and individual defendants in "boiler-room" stock scheme).

### D.   Defendants Shall Be Held Jointly and Severally Liable for All Monetary Relief

In this case, joint and several liability among and between Defendants Ikahn and Safeguard is appropriate. In *Liu v. SEC*, 591 U.S. 71 (2020), the Supreme Court held that "partners engaged in concerted wrongdoing" may be "found liable for profits as partners in wrongdoing." *Id*. at 90. Courts interpreting *Liu* have held individuals jointly responsible when the individual exercised decision-making authority over the entity, controlled an entity's finances, or

served as its officer. *See, e.g.*, *SEC v. Johnson*, 43 F.4th 382, 390–91 (4th Cir. 2022) (entity defendant and the individual defendant were "partners engaged in concerted wrongdoing" under *Liu* where the individual "founded the company and served as its Chief Executive Manager and controlling member," "had the power to make decisions on behalf of the company, hire and fire employees, control the [entity's] bank accounts, and develop and implement company policies"); *SEC v. Stack*, 2023 WL 1325495, at *9 (Jan. 31, 2023), *report and recommendation adopted*, 2023 WL 3069764 (W.D. Tex. Mar. 8, 2023) (imposing relief jointly and severally against entity and individual who was its CEO, president, secretary, director, and treasurer.).

In the Ninth Circuit, federal courts apply the law of the forum state to determine whether an individual and an entity are alter egos. *Towe Antique Ford Found. v. IRS*, 999 F.2d 1387, 1391 (9th Cir. 1993). Under California law, an alter ego relationship exists "where two conditions are met: First, where 'there is such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased'; and, second, where 'adherence to the fiction of the separate existence of the corporation would…sanction a fraud or promote injustice.'" *In re Schwarzkopf*, 626 F.3d 1032, 1038 (9th Cir. 2010). Factors suggesting an alter ego relationship include, among other things, the commingling of funds, the treatment by an individual of the assets of the corporation as his own, and disregarding corporate formalities. *Id.* at 1038.

Ikahn founded Safeguard, owned 100% of the company, and had total control over the company's operations. Compl. ¶ 12. Safeguard did not observe corporate formalities such as identifying officers and directors. At first, Ikahn handled all aspects of Safeguard's business, including contacting investors personally. *Id.* ¶ 15. Ikahn subsequently created Safeguard's initial sales pitch, drafted certain sales scripts, hired Safeguard's sales agents, and trained them. *Id*. Ikahn also purchased all of the coins, determined the prices at which Safeguard

would sell the coins to investors, and knew or was reckless in not knowing that the markups greatly exceeded the amounts listed in the "Precious Metals Shipping and Account Agreement" that he created and that was included on Safeguard's public website. *Id*. ¶¶ 15, 36. He also was the sole decision maker for the company, *id*. ¶ 12, and the only person authorized to transact in the company's bank accounts. (Javorski Decl. ¶ 6.) Ikahn also used Safeguard's bank accounts to pay his personal expenses, including cash withdrawals, payments for luxury vehicles and payments to other businesses under his control. Compl.*, ¶ 7. As a result, Safeguard was an alter ego of Ikahn. Thus, Defendants should be held jointly and severally liable for any monetary relief imposed by the Court.

### E.    Setoffs For Judgments Entered in the Parallel CFTC Matter

On February 1, 2022, the Commodity Futures Trading Commission ("CFTC") filed a parallel action against Safeguard and Ikahn based on the same underlying conduct that is the subject of the SEC's Complaint. *See CFTC v. Safeguard Metals LLC*, *et al.,* Case No. 2:22-cv-00691 (C.D. Cal.), ("CFTC Action"). The CFTC Action was joined by more than 30 state regulators. In October 2023, the CFTC and state regulators reached bifurcated settlements with Safeguard and Ikahn. Like the settlements in this case, the settlements in the CFTC Action provide for full injunctive relief, and leave the quantification of monetary relief to be decided by the Court upon the CFTC's motion.

Presumably the CFTC will seek restitution and a penalty against Ikahn and Safeguard. Thus, the Final Judgments the Court will enter contemporaneously herewith include an offset against the proposed disgorgement for any amounts Defendants pay in restitution to the CFTC, and an offset against the proposed penalty amount for any amounts Defendants pay in penalties to the CFTC. Any Final Judgments in the CFTC Action will similarly include an offset for any amounts Defendants pay to the SEC. *See, e.g.*, *CFTC v. Capitalstreet Fin., LLC,* No.

3:09-CV-387, 2012 WL 79758, at *17 (W.D.N.C. Jan. 11, 2012) (offsetting any payments made in restitution to CFTC or in disgorgement to SEC).

## CONCLUSION

For all the foregoing reasons, the Court **GRANTS** Plaintiff's Motion for Remedies.

**IT IS SO ORDERED.**

Dated: May 2, 2025

_____
Honorable John F. Walter
United States District Judge

16